UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JEROME HARTMAN,                                    MEMORANDUM
                                                   AND ORDER
                                                   00-CV-6107 (JG)
                    Plaintiff,

        - against -

CARLYLE I. HOLDER, *et al*.

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
A P P E A R A N C E S:

        JOSHUA HILL
                Paul, Weiss, Rifkind, Wharton & Garrison, LLP
                1285 Avenue of Americas
                New York, N.Y. 10019
                Attorneys for Plaintiff

        ROSLYNN R. MAUSKOPF
                United States Attorney
                Eastern District of New York
                One Pierrepont Plaza, 14th Fl.
                Brooklyn, N.Y. 11201
        By:     Jennifer Schantz
                Assistant United States Attorney
                Attorneys for Defendants

JOHN GLEESON, United States District Judge:

            Plaintiff Jerome Hartman was attacked by other inmates armed with razors while

incarcerated at the Metropolitan Detention Center ("MDC"). He brings claims arising from this

attack pursuant to principles set forth in *Bivens v. Six Unknown Named Agents of Federal Bureau

of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

(the "FTCA"). Specifically, Hartman alleges that (1) Unit Counselor Mieles and Corrections

Officer Sanders violated Hartman's due process rights because they had actual knowledge that

Hartman was in danger of being assaulted by other inmates but failed to protect him; (2) Corrections Officers John Doe 1 and John Doe 2 violated Hartman's due process rights because they knew that Hartman's wounds required hospital care, but deprived him of that care in deference to their own personal schedules; (3) Sanders breached her duty of care by leaving inmates unsupervised and not stopping the assault quickly enough once it was discovered; and (4) Carlyle I. Holder, the Warden of the MDC at the time of the attack, breached his duty of care to Hartman by failing to implement a policy to secure razors distributed to inmates and failing to prevent razors from being used as weapons.

Defendants move to dismiss, arguing that (1) the constitutional claims should be dismissed for failure to exhaust administrative remedies pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"); and (2) this Court lacks subject matter jurisdiction over Hartman's tort claims because the acts complained of fall within the discretionary function exception to the FTCA. For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

BACKGROUND[1]

A.     The Assault

In March 1998, Hartman was arrested and placed in custody at the MDC pending trial. In early to mid-June 1998, he began to suspect that inmates Peter Blake and Tyrone Greene were planning to assault him. Hartman believed that inmates associated with Blake and Greene had recently assaulted Hartman's acquaintance. He also noticed that Blake and Greene were

---

[1]     The factual background is based on the allegations set forth in Hartman's complaint. For the purposes of this motion, I assume that these allegations are true. *See Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995).

hoarding prison essentials, which signaled to Hartman that they were anticipating transfer to the "hole" – as the Special Housing Unit or "SHU" is referred to – which is a common disciplinary measure following fights between inmates.

At about 10:30 a.m. on June 24, 1998, Hartman approached Unit Counselor Mieles and requested a transfer out of Unit 3 North (where he, Blake and Greene were housed) to an adjacent unit. Hartman told Mieles that he did not feel safe in Unit 3 North. Mieles assured Hartman that he would be moved out of the Unit at the 4:00 count. At about 2:30 p.m., Hartman reminded Mieles that he feared assault and needed to be transferred. At around 3:30 p.m., Hartman again requested a transfer from Mieles. Mieles replied that it was too late for Hartman to transfer on that day (Mieles's shift ended at 4:00 p.m.), and Hartman would have to wait until the next day.

Shortly after 4:00 p.m., Greene approached Hartman, told him that Hartman's acquaintance was a "snitch," and reminded Hartman that his acquaintance had been assaulted. Hartman understood this to be a threat, so he approached Officer Sanders and informed her of the "ongoing problems" he was having with Greene and Blake. Hartman again asked to be moved out of Unit 3 North.

Shortly after 11:00 p.m. – which was "lights out" – Sanders exited the dormitory room in which the detainees in Unit 3 North slept, leaving the room unsupervised. Greene, Blake, and other inmates attacked Hartman. Blake cut Hartman with a razor in the back and neck while Greene and other inmates held Hartman and punched him. Hartman yelled for the "C.O." – meaning Sanders – and Blake cut him across the face with a razor. Blake continued to cut

Hartman, who assumed a defensive position on the floor while Greene and other inmates repeatedly kicked and punched him.

When Sanders returned to the dormitory, she saw the assault but did not act immediately to stop it. Rather, she turned on the lights, left the room, locked the door behind her, and then sounded the "body alarm." Subsequently, MDC staff arrived and pulled Greene and Blake off of Hartman. Hartman was covered in blood and suffering from numerous lacerations to the face, neck, chest, back, and arms.

B.    The Medical Treatment

After the attack, an MDC physician's assistant examined Hartman and recommended that he be sent to the hospital. Corrections Officers John Doe 1 and John Doe 2 accompanied Hartman to the hospital. While traveling with Hartman, the officers complained that they did not want to spend their night supervising Hartman. At the hospital, Hartman heard a nurse inform the officers that Hartman's wounds required stitches. Reluctant to supervise Hartman for the amount of time required to stitch his wounds, the officers decided to return Hartman to the MDC before he received stitches or other care. At the MDC, Hartman's wounds were cleaned superficially; the cuts were never stitched. Hartman was placed in the SHU with open, bleeding wounds.

C.    The Razor Policy

Upon admission to the MDC, an inmate is provided with a "kit" containing a razor, among other items. Despite "rampant use" of razor blades in inmate-on-inmate assaults, MDC staff does not maintain an inventory of razors distributed to inmates, nor do they secure razors once they are distributed. The kits of inmates in Unit 3 North are not inspected to ensure

that an inmate's blade has not been detached from the razor. Blake was provided with a razor by MDC staff, and at no time prior to the assault on Hartman did MDC staff inspect or secure Blake's razor.

D.    Procedural History

On December 17, 1999, Hartman filed a timely administrative tort claim with the BOP pursuant to 28 C.F.R. § 543.31. On May 19, 2000, the Bureau of Prisons ("BOP") denied the claim, and instructed Hartman that he could file a complaint in a federal district court within six months. On October 11, 2000, Hartman filed a *pro se* complaint in this Court, naming Warden Holder as defendant. Holder was served on January 17, 2001, and his answer was due on February 6, 2001. Rather than serving the U.S. Attorney, the Marshal served a copy of the complaint on the New York City Law Department. On June 3, 2003, the United States finally filed Warden Holder's answer to the complaint, certifying that he was acting within the scope of his employment and substituting the United States as defendant pursuant to 28 U.S.C. § 2679(d).

In January 2005, Hartman secured pro bono counsel. On March 22, 2005, an amended complaint was filed. On May 24, 2005, the Government moved to dismiss the amended complaint on behalf of defendants Holder, Mieles, Sanders, and the United States. In its motion, the Government stated: "At this time, the Office does not yet represent defendants John Doe 1 or John Doe 2. Plaintiff's claims against them, however, also should be dismissed [for the reasons set forth in the motion to dismiss.]" Def.'s Br. at 1 n.1.

DISCUSSION

A.    The Standard for Dismissal Under Rule 12(b)(1) and 12(b)(6)

When considering a motion to dismiss for lack of subject matter jurisdiction or for

5

failure to state a cause of action, a court must accept as true all material factual allegations in the complaint. *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Dismissal under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992) (quotation marks omitted). A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer*, 416 U.S. at 236. The appropriate inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court does not draw inferences favorable to the party asserting jurisdiction. *Shipping Fin.*, 140 F.3d at 131; *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992). A court may consider affidavits and other materials in addition to the pleadings to resolve the jurisdictional question. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 n.6 (2d Cir. 2001).

B.    <u>Hartman's Claims</u>

    1.    <u>*Bivens* Claims</u>

Hartman asserts that his due process rights were violated because: (1) Unit Counselor Mieles and Corrections Officer Sanders had actual knowledge that Hartman was in

danger of being assaulted by other inmates and failed to protect him; and (2) Corrections Officers Doe 1 and Doe 2 knew that Hartman's wounds required medical care but removed him from the hospital in deference to their personal schedules. Hartman seeks money damages for the asserted constitutional violations under principles set forth in *Bivens*. *See Davis v. Passman*, 442 U.S. 228 (1979) (extending *Bivens* to due process claims). Defendants assert that Hartman's *Bivens* claims should be dismissed for failure to exhaust administrative remedies.[2]

Under the Prison Litigation Reform Act ("PLRA"), prisoners must first exhaust available administrative remedies before bringing an action alleging violations of federal law. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); 42 U.S.C. § 1997e(a) ("[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter*, 534 U.S. at 532).

In the federal system, inmates are required to comply with a four-step administrative grievance process referred to as the "Administrative Remedy Program" ("ARP"). *See* 28 C.F.R. § 542.10 *et seq.* This process requires an inmate to (1) present his concern informally to a staff member, who must attempt to resolve the concern; (2) if the inmate's issue

---

[2]     Hartman brings claims against the defendants in both their individual and official capacities. *Bivens* claims can only be brought against a federal employee in his individual capacity. Such claims cannot be maintained against the United States, its agencies, or its employees in their official capacity. *See Robinson v. Overseas Military Sales Corp.*, 21 F. 3d 502, 510 (2d Cir. 1994). Thus, to the extent that Hartman is asserting constitutional claims against the defendants in their official capacities, those claims are hereby dismissed.

cannot be resolved at step one, the inmate must submit an Administrative Remedy Request (using a BP-9 form) to a designated staff member (usually the warden) within 20 days following the date on which the basis for the request occurred; (3) if the inmate is dissatisfied with the warden's response, the inmate can submit an appeal to the Regional Director (using a BP-10 form) within 20 days of the warden's response; and (4) if the inmate is dissatisfied with the Regional Director's response, he must file an appeal with the Office of General Counsel (using a BP-11 form) within 30 days of the Regional Director's response. 28 C.F.R. §§ 542.10-542.15. Only after fully exhausting this formal process may an inmate file an action asserting constitutional violations in a federal district court.

Hartman's arguments on this motion implicate another regulation as well. An inmate who fails to file an Administrative Remedy Request form (BP-9) within 20 days may file for an extension of time to do so. The regulation governing the request for an extension reads as follows:

> Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

28 C.F.R. § 542.14(b).

Here, there is no dispute that under the PLRA, Hartman was required to exhaust the ARP remedies before bringing his *Bivens* claims in this court. It is also undisputed that Hartman failed to exhaust those remedies; indeed, he did not use them at all.

Where a prisoner fails to exhaust administrative remedies but asserts a plausible reason for the failure, a court conducts a three part inquiry. Specifically, it determines whether: (1) administrative remedies were in fact available; (2) defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it; or (3) defendants acted to inhibit the inmate from exhausting his remedies. *Hemphill v. State of New York*, 380 F.3d 680, 686 (2004). Courts also "consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Id.* (internal quotations omitted); *cf. Giano*, 380 F.3d at 677 ("the PLRA's exhaustion requirement is not so rigid as to permit the barring of all suits brought after administrative remedies are no longer available, regardless of the circumstances, and simply because the plaintiff failed to follow prison grievance procedures to the letter.").

Here, Hartman argues that his failure to exhaust administrative remedies should be excused because (1) the government forfeited the exhaustion defense; and (2) there are special circumstances which prevented exhaustion. For the reasons discussed below, I disagree.

a.    Forfeiture of Exhaustion Defense

Hartman asserts that the government forfeited the right to assert an exhaustion defense because it failed to file a response to the complaint for almost two and one-half years. Hartman asserts that this untimely pleading prejudiced Hartman because once the government did file its answer, Hartman had been released from prison and administrative remedies were no

longer available to him.  Had the government filed a timely answer, Hartman asserts, he could have discontinued his *Bivens* action and renewed it after exhausting the available administrative remedies.  Specifically, he could have filed for an extension pursuant to 28 C.F.R. § 542.14(b); if the extension was granted, he could then have exhausted the available remedies.

Under the ARP, Hartman was required to file an "Administrative Remedy Request" (BP-9) form within 20 days "following the date on which the basis for the Request occurred."  28 C.F.R. § 542.14.  The events at issue here took place on June 24 and 25, 1998.  Accordingly, Hartman was required to file the BP-9 form by July 15, 1998.  He made no complaint of any sort for more than 17 months after that cutoff date, filing his administrative tort claim with the BOP on December 17, 1999.  He filed his complaint in this case on October 11, 2000.  Thus, even had the government timely responded to the complaint, Hartman would have already been more than two years late in filing for administrative remedies.

Hartman asserts several reasons for his delay, which he claims would have been valid reasons for an extension of the 20-day deadline had he sought one in late 2000.  First, Hartman argues that he did not follow the ARP grievance procedures because he believed that filing an administrative tort claim was sufficient.  The belief that satisfying the FTCA's exhaustion requirements also satisfies the PLRA/ARP requirements is not a valid reason for granting an extension of time to file.  *See* 28 C.F.R. § 542.14(b) (valid reason for delay "means a situation which prevented the inmate from submitting the request within the established time frame").  There is nothing in the FTCA procedures that prevented Hartman from filing an ARP claim.

At oral argument, counsel advanced two other theories for why the delay might be excused: Hartman was in the midst of litigating his criminal case in the weeks following the attack;[3] and Hartman moved out of the MDC shortly after the incident.[4] Neither of these reasons would account for a delay of over two years before seeking an extension of time to file a claim. Accordingly, I reject Hartman's argument that the government forfeited an exhaustion defense by failing to timely respond to his complaint. Even had the government timely responded to the complaint with the present motion, Hartman would not have been able to exhaust his administrative remedies. He was years late in bringing a claim, and his reasons for the delay are not of the type that would have resulted in an extension of the time to file under 28 C.F.R. 542.14(b). *See Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004) (dismissing complaint where administrative remedies were available for a reasonable length of time and no special circumstances justified failure to exhaust).

       b.      <u>Special Circumstances Excusing Exhaustion</u>

Hartman argues that the government's delay in filing a response to Hartman's October 11, 2000 complaint, combined with Hartman's belief that his *Bivens* claims were encompassed by his timely-filed tort claim, created a "special circumstance" justifying his failure to pursue administrative remedies under the PLRA. I disagree.

---

[3]      Hartman pleaded guilty on June 23, 1998. *See* Docket Report, 98-cr-0422. At oral argument, counsel argued that during the 20 days following the attack Hartman "was dealing with CJA counsel. He was dealing with his underlying case, he was determining whether to take a plea. He had sentencing issues."

[4]      On July 17, 1998, Hartman was transferred from the MDC to the New York Metropolitan Correctional Facility, and subsequently was transferred elsewhere. *See* Letter from Joshua Hill to the Court dated July 22, 2005. Hartman has not asserted that there was an "extended period in-transit during which [he] was separated from documents needed to prepare the Request." *See* 28 C.F.R. 542.14(b).

The Second Circuit has stated that "there are certain 'special circumstances' in which, though administrative remedies may have been available . . . the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano*, 380 F.3d at 676.  Justification for not following procedural requirements "must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Id.* at 678.  The Second Circuit has held that an inmate's reasonable interpretation of grievance procedures may justify his failure to exhaust administrative remedies.  *See id. at* 676-78 (plaintiff reasonably interpreted New York Department of Correctional Services regulations to preclude the filing of a grievance on matters related to disciplinary proceedings); *see also Rodriguez v. Westchester County Jail Corr. Dep't*, 372 F. 3d 485, 486-88 (2d Cir. 2004) (reasonable interpretation of the PLRA to not require exhaustion for claims of excessive force – an interpretation which the Second Circuit accepted and which was later rejected by the Supreme Court, *see Nussle v. Willette*, 224 F.3d 95, 100 (2d Cir. 2000), *rev'd, Porter*, 534 U.S. at 523 – justified failure to exhaust).

For the reasons discussed above, the government's delay in responding to the complaint does not contribute to a special circumstance excusing exhaustion.

i.    Filing of Tort Claim

Hartman asserts that he reasonably believed that fulfilling the administrative requirements for an FTCA claim satisfied the requirements for bringing any claim arising from the attack, including *Bivens* claims, and thus justified his failure to exhaust.

To bring a claim under the FTCA, an inmate must mail or deliver an administrative tort claim to the appropriate BOP regional office within two years of the

underlying incident.  28 C.F.R. § 543.31(c); 28 U.S.C. § 2401.  After considering the merits of

the claim, the Regional Counsel will either deny the claim or propose a settlement.  *See* 28

C.F.R. § 542.32(d).  Denial of a claim by the Regional Counsel is considered a final agency

action for exhaustion purposes, 28 C.F.R. § 543.32(g), after which an inmate can bring an action

under the FTCA in district court.

Here, Hartman submitted DOJ Standard Form 95 ("Claim for Damage, Injury, or

Death")  to the appropriate BOP office on December 17, 1999.  The claim described the attack on

Hartman by Blake and other inmates, the purported negligence of "the officer on duty at 11:45

pm on June 24, 1998," who "could have helped me but choosed [sic] to wait[] for the other

officers to arrive," and the negligence of the Warden and his staff for giving razors to inmates.

Lilien Decl. Ex. A.  Hartman sought $13,500,000 in compensatory damages.

In a memorandum dated May 15, 2000, the BOP Regional Counsel denied

Hartman's administrative tort claim.  In conclusion, the memorandum stated: "If you are

dissatisfied with this decision, you may seek reconsideration from this office or bring an action

against the United States in an appropriate United States District Court within six (6) months of

the date of this memorandum."

Hartman argues that, as a *pro se* plaintiff, he reasonably believed that his timely

"Claim for Damage, Injury, or Death" included all claims grounded in the June 24, 1998 attack.

Further, Hartman asserts that this reasonable belief was buttressed by the May 15, 2000

memorandum denying the administrative claim, which stated that he could file suit in federal

court within six months.[5]

---

[5]      Hartman asserts that his belief was further bolstered by this Court's Order dated
December 13, 2000 granting leave to proceed without being required to prepay the $150 filing

The FTCA and the PLRA have distinct purposes, and accordingly have distinct procedural requirements. The purpose of the PLRA's exhaustion requirement is

> to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation . . . . And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Porter*, 534 U.S. at 524-25. In keeping with this purpose, the ARP has a very short filing deadline, which facilitates a prompt internal investigation.

The purpose of requiring an administrative claim before bringing suit under the FTCA, on the other hand, is "to provide the government agency with sufficient notice to investigate the incident resulting in the claim and prepare for settlement negotiations." *Gaughan v. BOP*, 2003 WL 1626674, at *2 (N.D. Ill. March 25, 2003). "In other words, the function of the tort claim administrative process is essentially to prepare for litigation; the purpose of exhaustion of prison grievance procedures is to avoid litigation." *Id.*

Nothing in the FTCA regulations reasonably suggests that an inmate could bring a claim under its procedures for something other than a claim for "money damages for personal injury or death and/or damage to or loss of property." *See* 28 C.F.R. § 543.30 ("Purpose and scope" of FTCA). Satisfying the requirements for bringing an FTCA claim does not justify the failure to exhaust the ARP procedures. *See Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 368 (E.D.N.Y. 2005) ( "The filing of an administrative tort claim by a prisoner does not excuse the

_____

fee. That Order stated that "this Court cannot conclude on the present record that this action is frivolous or malicious under the meaning of 28 U.S.C. § 1915."

prisoner's failure to meet the separate exhaustion requirements for a *Bivens* claim under the

PLRA."); *Owusu v. BOP*, 2003 WL 68031, at *2 (S.D.N.Y. Jan. 7, 2003); *Hylton v. BOP*, 2002

WL 720605, at *2 (E.D.N.Y. March 11, 2002); *Funches v. Reish*, 1998 WL 695904, at *9

(S.D.N.Y. Oct. 5 1998); *Gaughan*, 2003 WL 1626674, at *2.

Hartman notes that at the relevant time, 28 C.F.R. § 542.12(b) stated that

"Requests or Appeals will not be accepted under the Administrative Remedy Program for claims

for which other administrative procedures have been established, including tort claims . . . ." *See*

61 Fed. Reg. 86-01 (Jan. 2, 1996). Hartman has not asserted, however, that he read this

provision and interpreted it to govern whether or not he should file under the ARP. *Cf. Giano,*

380 F.3d at 676-678 (prisoner's reasonable interpretation of DOCS regulation justified failure to

exhaust). Moreover, when read in its entirety, the provision would not be reasonably susceptible

to such a an interpretation. It read's:

> (b) Requests or Appeals will not be accepted under the
> Administrative Remedy Program for claims for which other
> administrative procedures have been established, including tort
> claims, Inmate Accident Compensation claims, and Freedom of
> Information or Privacy Act requests. Staff shall inform the inmate
> in writing of the appropriate administrative procedure if the
> Request or Appeal is not acceptable under the Administrative
> Remedy Program.

61 Fed. Reg. 86-01.

Hartman was required to grieve through the ARP program. His decision to file an

administrative tort claim seventeen months after the attack does not constitute "special

circumstances" excusing exhaustion of administrative remedies. The motion to dismiss

Hartman's *Bivens* claims is granted as to all defendants.[6]

    2.    FTCA Claim

        Hartman alleges that (1) Officer Sanders breached her duty of care by leaving

inmates unsupervised and by not stopping the assault quickly enough once it was discovered; and

(2) Warden Holder breached his duty of care to Hartman by failing to implement a policy to

secure razors distributed to inmates and failing to prevent the razors from being used as weapons.

Defendants assert that this Court lacks subject matter jurisdiction because Sanders and Holder's

actions fall within the discretionary function exception to the FTCA.[7]

        The FTCA waives the sovereign immunity of the United States for personal injury

suits "caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment." 28 U.S.C. 1346(b)(1). This waiver,

however, is limited in several respects. The relevant limitation here is the so-called

"discretionary function exception." The United States cannot be held liable for claims based on

"the exercise or performance or the failure to exercise or perform a discretionary function or duty

on the part of a federal agency or an employee of the government, whether or not the discretion

involved be abused." 28 U.S.C. § 2680(a). This exception prevents "judicial second-guessing of

legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 325 (1991)

(internal quotation omitted). If a claim falls within the exception, a federal court does not have

---

[6]        The government argues in their reply papers that the *Bivens* claims are time barred.
Because Hartman failed to exhaust administrative remedies, I need not address this issue.
[7]        The exclusive remedy under the FTCA is against the United States. 28 U.S.C. §
2679(d)(1). To the extent that Hartman makes claims under the FTCA against Sanders or Holder
as individuals, those claims are hereby dismissed.

subject matter jurisdiction over the claim. *See Fazi v. United States*, 935 F.2d 535, 537 (2d Cir. 1991).

For the discretionary function exception to apply, two conditions must be met: "(1) the acts alleged to be negligent must be discretionary, in that they involve 'an element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (quoting *Berkowitz v. United States*, 486 U.S. 531, 536-37 (1988), *Gaubert*, 499 U.S. at 322-323). The discretionary function exception "is not limited to decisions made at the policy or planning level, but rather extends to decisions at the operational level that are in furtherance of governmental policy." *Palay v. United States*, 349 F.3d 418, 429 (7th Cir. 2003) (citing *Gaubert*, 499 U.S. at 325).

a.    Officer Sanders

Hartman asserts that Sanders was negligent because she left the inmates unsupervised in an unlit room and did not properly respond after Hartman was attacked. Specifically, Hartman alleges that, having discovered the attack, Sanders: failed to tell the inmates to stop attacking Hartman; left the room where the attack was occurring; locked the door behind her; and (only) then sounded the alarm.

Hartman contends that Sanders's actions were governed by the statutorily mandated duty of care that prison officials owe to inmates, and thus were not discretionary in nature. 18 U.S.C. § 4042(a) states that the BOP must "provide for the safekeeping, care, and . . . protection . . . of all persons charged with or convicted of offenses against the United States." This provision, however, does not compel an officer to act in a particular way when supervising

inmates or when confronted with inmate-on-inmate violence, and thus does not bring Sanders's actions out of the ambit of the discretionary function exception. *See*, *e.g.*, *Calderon v. United States*, 123 F. 3d 947, 950 (7th Cir. 1997) (while § 4042(a) "sets forth a mandatory duty of care, it does not . . . direct the manner by which the [BOP] must fulfill this duty."); *Taveras v. Hasty*, 2005 WL 1594330, at *3 (E.D.N.Y. July 7, 2005) (§ 4042(a) "sets forth no particular conduct BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates.") (internal quotation omitted); *cf. Berkowitz*, 486 U.S. at 536 (discretionary function exception does not apply where injury is caused by the failure to comply with a regulation that "specifically prescribes a course of action for an employee to follow.").

Here, the duty of care owed by officers to inmates did not compel Sanders to act in a particular way when supervising inmates or when confronted with inmate-on-inmate violence. Accordingly, I find that Sanders has satisfied the first prong of the discretionary function exception.

The second prong of the discretionary function exception – whether the action taken is subject to policy analysis – presents a closer question. On the broadest level, any action taken by a prison official concerning the supervision of inmates is susceptible to policy analysis. *Cf. Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (decisions of how to respond to a reported threat upon an inmate implicate social and public policy considerations). The discretionary function exception analysis, however, focuses on whether the specific action in question involves "choices motivated by considerations of economy, efficiency, and safety." *Coulthurst v. United States*, 214 F.3d at 109-110 (contrasting negligence grounded in consideration of public policy with other types of negligence not shielded by the discretionary

function exception; collecting cases).

The government argues that "Sanders' [sic] judgment about how to supervise the inmates and when and how to break up an inmate fight implicates a number of public policy considerations including inmate safety, general concerns for prison security, the interests of inmates, and the effective use of limited resources." Br. at 15. While this plausible rationale may bring Sanders's actions within the discretionary function exception, the government has not offered any testimony from Sanders concerning her actual judgment at the time. *See Robinson v. Gov't of Malaysia*, 269 F.3d at n.6 (court may consider affidavits in addition to the pleadings to resolve the question of subject matter jurisdiction); *cf. Taveras*, 2005 WL 1594330 at * 4 (on motion for summary judgment, officer's decision to wait for back-up instead of immediately attempting to break up fight falls within the discretionary function exception); *The Estate of Charles Gary Sammons*, 94-C-166-S, slip op. (W.D.Wis. Aug 11, 1994) (attached to Def.'s Br.) (discretionary function exception warranted summary judgment where unarmed correction officer stepped between fighting inmates, but then backed away "because in his judgment he could not handle the situation himself."). At the motion to dismiss stage, however, Hartman need only show that there is a set of facts consistent with his allegations for which he would be entitled to relief. *Swierkiewicz*, 534 U.S. at 514. I cannot say as a matter of law that Sanders's actions may not implicate negligence "unrelated to any plausible policy objectives." *Coulthurst*, 214 F.3d at 655; *see also Taveras*, 2005 WL 1594330 at * 4 (discretionary function exception does not apply where plaintiff can show that actions of prison personnel were the result of laziness or carelessness). Accordingly, the motion to dismiss the FTCA claim grounded in Sanders's action is denied.

b.      Warden Holder

Hartman asserts that Holder's failure to implement a policy to secure razors distributed to inmates and to prevent the razors from being used as weapons breached his duty of care. Hartman asserts that the discretionary function exception does not apply because Holder's actions were governed by the statutory duty of care (18 U.S.C. § 4042(a)(2)) and the regulations and "implementing information" concerning inmate grooming (set forth at 28 C.F.R. §§ 551.4, 551.6 and BOP Program Statement 5230.05 (1996)).

As discussed above, the statutory duty of care owed to inmates does not prescribe a specific course of action that an employee must follow. 18 U.S.C. § 4042(a) does not compel a warden to adopt a particular policy for providing razors to inmates, and thus does not remove claims from the ambit of the discretionary function exception.

Hartman argues that the rules and implementing information concerning hair length and personal hygiene set forth at 28 C.F.R. §§ 551.4, 551.6 and BOP Program Statement 5230.05 compel a warden to adopt a policy that razors be provided only upon request, be used under staff supervision, and be securely stored when not in use. I disagree.

i.      Hair Length

28 CFR § 551.4, entitled "hair length," states that the warden "may not restrict hair length if the inmate keeps it neat and clean." The implementing information, set forth at Program Statement 5230.05.8, states that "[a]n inmate may have a shaved head or long hair." It further states that:

>   Where practicable, hair is to be cut in a room or rooms specifically
>   designated for that purpose. A multi-purpose area may be used
>   where this is not practicable. Hair cutting shall be done in an area
>   that permits observation by staff. Equipment must be stored

securely when not in use. A current inventory of hair cutting
equipment shall be maintained.

BOP PS 5230.05.8.

Hartman argues that because inmates may use a razor to shave their heads, razors
are "hair cutting equipment" within the meaning of 5230.05.8 and must be treated accordingly.[8]
A plain reading of the implementing information concerning "hair length," however, is that the
equipment in question is the type used to "cut" hair, such as scissors or electric clippers. Even if,
as Hartman argues, some inmates used disposable razors to shave their heads, this does not
transform those razors into hair cutting equipment within the plain meaning of 5230.05.8.

ii.    Personal Hygiene

28 CFR § 551.6, entitled "personal hygiene,"states that the warden "shall make
available to an inmate those articles necessary for maintaining personal hygiene." The
implementing information set forth at PS 5230.05.10 lists "soap, toothbrush, toothpaste or
powder, comb, and toilet paper" as "examples" of necessary articles to be made available to
inmates. Further, 5230.05.10 states: "For women, products for female hygiene needs shall be
available. Shaving equipment is to be available upon request."

Hartman argues that the omission of razors from the list of necessary articles in
5230.05.10 means that a warden could not provide razors to inmates as an article necessary for
personal hygiene. § 551.6, however, does not compel the warden to provide (or prevent an

8       Hartman argues that there is a disputed issue of fact whether inmates used razors to shave
their heads. *See* Pl.'s Sur-Reply at 4 (comparing Declaration of MDC Support Supervisor
Lissette Ortiz-Garcia ¶¶ 3-4: "In 1998, inmates at MDC used electrical barber clippers to cut and
shave one another's hair. The electrical barber clippers were stored in the custody of the
Correctional Services department when not in use."; with Hartman Decl. ¶ 3, "inmates used
shaving razors to shave and/or trim their hair."). For the purposes of this motion, I assume that
Hartman's assertion that inmates used disposable razors to shave their heads is true.

inmate from receiving) a specific item. The list of articles set forth in the BOP's policy statement does not purport to be an exhaustive one, and does not preclude a warden from determining that razors are necessary for maintaining personal hygiene. *Cf. Ortiz v. United States*, 2002 WL 1492115, at *4 (S.D.N.Y. Jul. 11, 2002) (provision of shaving razors to inmates falls within discretionary function exception; 28 C.F.R. § 551.6 does not state what items are necessary or what manner those items should be made available.)

Hartman asserts that the statement "[s]having equipment is to be available upon request," supports his theory that 5230.05.10 forbids the provision of razors as necessary articles. In context, however, this statement obviously refers to personal hygiene articles to be made available to women. I decline to accept Hartman's tortured interpretation of the provision as precluding the provision of razors to all male inmates as items necessary for maintaining personal hygiene.

In sum, no statute or regulations compels a warden to adopt a particular policy concerning the provision of razors to inmates.

There is no dispute that the Warden's decisions concerning razor policy meet the second prong of the discretionary function exception. The provision of razors to inmates implicates important security and hygiene questions, and thus is susceptible to policy analysis. Accordingly, Warden Holder's "failure" to implement a policy to secure razors and to prevent razors from being used as weapons are actions that fall within the discretionary function exception. Hartman's FTCA claim based on these actions is therefore dismissed for lack of subject matter jurisdiction.

<u>CONCLUSION</u>

The *Bivens* claims against all defendants and the FTCA claim grounded in the MDC's razor policy are dismissed. The motion to dismiss the FTCA claim grounded in Officer Sanders's supervision of inmates on the night of June 24, 1998 and her actions during the attack on Hartman is denied.

So Ordered.


John Gleeson, U.S.D.J.

Dated: August 21, 2005
      Brooklyn, New York