UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
JEROME HARTMAN,                                                   :
                                                                  :
        Plaintiff,                                          :    **AMENDED MEMORANDUM**
                                                                  :    **AND ORDER**[1]
                                                                  :
        - against -                                        :    1:00-cv-6107-ENV-JMA
                                                                  :
CARLYLE I. HOLDER; UNIT COUNSELOR                                 :
MIELES; CORRECTIONS OFFICER                                       :
L. SANDERS; CORRECTIONS OFFICER JOHN                              :
DOE 1; CORRECTIONS OFFICER JOHN DOE 2,                            :
collectively in their individual and official                     :
capacities; and UNITED STATES OF AMERICA,                         :
                                                                  :
        Defendants.                                         :
                                                                  :
------------------------------------------------------------------X

**VITALIANO, D.J.**

      On the night of June 24, 1998, several inmates of the Metropolitan Detention Center ("MDC") in Brooklyn, New York, including one armed with a razor, attacked a fellow inmate, plaintiff Jerome Hartman. This action followed. The active complaint in this matter, dated March 22, 2005, sought relief from the MDC's former warden, Carlyle Holder, a unit counselor at the facility, Jose Mieles, Corrections Officer Lorraine Sanders, two unknown corrections officers, John Does 1 and 2, and the United States, pursuant to constitutional claims governed by Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and statutory claims under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* (the "FTCA").

---

[1] The Court first issued this Memorandum and Order on January 30, 2009, but ordered that it be temporarily sealed to afford the parties the opportunity to review it and seek redactions of any potentially confidential information in light of the three protective orders previously entered in this matter by Magistrate Judge Azrack. See Docket Entry Nos. 57, 67, 80. The United States subsequently moved to redact certain portions of the opinion and the Court scheduled argument on that motion for March 10, 2009. At the March 10 hearing, the government informed the Court that it was withdrawing its request to redact portions of the opinion. Accordingly, the Court issues the Memorandum and Order without redaction.

By Memorandum and Order dated August 21, 2005, Docket Entry No. 50, 2005 WL 2002455 ("Hartman I"), this Court (per Gleeson, J.) dismissed all of Hartman's causes of action except his FTCA claim grounded in the conduct and decisions of Officer Sanders, the viability of which is presently at issue. In this remaining claim, Hartman alleges that Officer Sanders breached her duty of care on the night of the assault by carelessly (1) failing to report threats made against Hartman that plaintiff allegedly relayed to her prior to the assault; (2) conducting rounds of her assigned area in a predictable, routinized fashion that gave the attackers an opportunity to carry out the assault; and (3) neglecting to be at her post at the time of the attack or, in the alternative, being inattentive to her duties even while technically at her post, so that as a result, she failed to respond to the assault on plaintiff for at least 15 minutes.

The United States moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3), arguing that the "discretionary function exception", a statutory carve-out for FTCA, applies to Officer Sanders's actions and decisionmaking on the night of the assault and deprives the Court of subject matter jurisdiction over Hartman's remaining claim. For the reasons set forth below, the Court holds that the discretionary function exception is inapplicable and denies defendant's motion to dismiss.

I. **BACKGROUND**[2]

A. **The Assault**

Jerome Hartman was arrested in March 1998 and placed in custody at the MDC pending trial. In late June 1998, plaintiff was transferred to Unit 3 North, a dormitory unit at the MDC which housed approximately 100 male inmates. At the time of Hartman's transfer, Unit 3 North

---

[2] The Court sets forth only those facts relevant to the instant motion directed at Hartman's remaining claim under FTCA, including, on this Rule 12(b)(1) motion, those facts presented by the parties but stated outside the four corners of plaintiff's pleading. See, e.g., APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999).

2

was set up as an open dormitory room with bunk beds for the inmates. Unit 3 North was located on the third floor of the MDC and connected to a second dormitory unit, Unit 3 South, by way of a hallway. A staff bathroom, an office, and a recreation deck were located off of the hallway that connected the units. At all times relevant to this lawsuit, Unit 3 North was assigned a unit team consisting of a unit manager, who supervised the unit team and the inmates in both Unit 3 North and South, a unit counselor, and a secretary. One corrections officer ("CO") was also always assigned to the unit.

Hartman alleges that, in the early morning of June 24, 1998, several inmates of Unit 3 North warned plaintiff that he needed to be careful because two other inmates housed in the unit, Peter Blake and Tyrone Greene, were planning to attack him. These warnings continued throughout the day and seemed credible to plaintiff because he could see Blake and Greene stockpiling prison essentials -- an indication to him that they anticipated being transferred to the Special Housing Unit, a more restrictive unit at the MDC where prisoners commonly were placed for disciplinary infractions, including fights between inmates.

In response to the warnings he was receiving, at around 10:30 that morning, Hartman approached his unit counselor, Jose Mieles. Hartman told Mieles that he had received threats to his safety and asked to be transferred to another unit. Hartman repeated this request several times throughout the day but was not transferred.[3] At 4 p.m., Mieles's shift concluded and he left the MDC for the day. At the same time, Corrections Officer Sanders began her shift in Unit 3 North.

At approximately 5 or 6 p.m., Hartman approached Officer Sanders and told her "what was going on," that he did not feel safe in the unit, and that he wanted to transfer to another

---

[3] The parties disagree about what steps, if any, Mieles took to act on Hartman's request. However, the Court need not resolve these disputes to evaluate plaintiff's sole remaining cause of action, which is, as already noted, addressed to the conduct and decisions of Officer Sanders.

3

location. (Hartman Dep. Tr. at 122:25-123:8.) According to plaintiff, Sanders responded that she would "see what she could do." (Id.) Sanders, for her part, does not recall this conversation, or any other, with Hartman on the evening of June 24, 1998, and her logbook does not contain an entry regarding plaintiff's purported complaint.

At 9 p.m., Officer Sanders counted the number of inmates present in Unit 3 North and logged it in her logbook as a "good count". (Pl.'s Ex. P at 2.) Two hours later, at 11 p.m., she placed the unit in "lock down" for the night. According to one of the Bureau of Prisons' ("BOP") Rule 30(b)(6) witnesses[4] in this matter, Carlos Martinez, during lock down, "[t]he TVs are shut off, all the rooms are locked, the activity rooms, the TV rooms, the kitchen, the unit door's secured, the recreation area, everything is shut down." (Martinez Dep. Tr. at 65:20-25.) At this time, the lights in the unit were dimmed as well, although there still was sufficient illumination for Officer Sanders to see "where [she was] going" and "exactly what's going on." (Sanders Dep. Tr. at 86:2-20.) At 11:30 p.m., Sanders began making rounds of Unit 3 North.

Sometime between 11:30 p.m. and 11:55 p.m. (see Pl.'s Ex. P at 2), Greene approached Hartman at his bed and tried to lure him to the rear of the dormitory room. Hartman did not comply and remained at his bed. However, while Greene was still speaking to him, Blake, Greene's accomplice, appeared, holding a razor. Blake attacked Hartman with the blade, slashing Hartman's face, neck, chest, and back while numerous other inmates struck plaintiff and tried to prevent him from running away. Hartman attempted to defend himself, while repeatedly yelling out to the "CO" -- Corrections Officer Sanders -- for help. (Hartman Dep. Tr. at 140:3-7.)

---

[4] Federal Rule of Civil Procedure 30(b)(6) permits a party to depose an organization, including a governmental agency, by examining persons designated by the organization to testify on its behalf "about information known or reasonably available to the organization."

But no help came, at least initially. Hartman says he observed Sanders "ste[p] out" of the unit prior to the fight (id. at 127:17-20), and it was not until the assault had gone on for what Hartman estimates was at least 15 minutes, that Sanders finally arrived on the scene. Sanders disputes portions of this account, testifying at her deposition that she did not step out of the unit, but rather was at her post and making rounds "around the beds" at the time of the attack. (Sanders Dep. Tr. at 83:7-9.) Sanders further stated that she did not see or hear anything to indicate an assault was taking place during this time until she came upon the scene itself. However, it appears that other inmates who were in the front of the dormitory room in Unit 3 North reported seeing and/or hearing the assault.

Upon discovering the assault still in progress, Sanders turned on the lights and yelled at the inmates to stop fighting. Sanders determined not to physically intervene in the assault without backup, and instead moved to a safe distance and activated her silent body alarm. Other corrections officers quickly responded to the alarm and the fight broke up.

Hartman, by now "bleeding profusely," was seriously injured in the attack. (Pl.'s Ex. Q at 2.)

**B.      Policies and Practices at Issue**

The parties agree that 18 U.S.C. § 4042, the federal statute that enumerates the duties of the BOP, requires that the BOP "provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States . . . [and] provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2) & (3). In addition to this broad statutory provision, Hartman alleges that numerous other regulations and rules prescribe in detail a course of conduct to be followed by BOP employees in situations like those

5

that confronted Officer Sanders in this matter. The government disagrees, arguing instead that the materials cited by plaintiff are merely guidelines that do not constitute official agency policy and do not mandate specific conduct for corrections officers.

To begin, Hartman asserts that corrections officers at the MDC must adhere to a series of "post orders" -- rules and regulations that "apply to a specific post that a correctional officer or employee would be working" (Passaniti Dep. Tr. at 17:18-18:5) and that "set special and specific instructions for how that individual should be doing [that] particular position" (id. at 19:17-19). One such post order which plaintiff identifies as relevant to the conduct at issue, and which was described as "mandat[ory]" by one of the BOP's Rule 30(b)(6) witnesses, Frank Passaniti (id. at 23:16-23), states in part that "[*o*]*fficers are to remain within bounds of their assigned post until properly relieved or directed otherwise by their supervisor*" (Pl.'s Ex. K at 3) (emphasis in original). According to Carlos Martinez, the BOP's other Rule 30(b)(6) witness, the post for a corrections officer assigned to Unit 3 North consisted of the dormitory room, the recreation deck, and the hall area. (Martinez Dep. Tr. at 79:5-14.) Echoing the post order to which Hartman points, Martinez testified that the only reason a CO would be permitted to leave her post would be "[i]f the lieutenant requested the officer to go, [and then] the lieutenant will go ahead and find a replacement." (Id. at 138:3-22.) Moreover, Hartman asserts that according to Martinez, COs were not allowed to leave inmates unattended in the dormitory room of a unit except to dim the lights or to take out the trash (id. at 73:2-20), and even then, only for short periods of time (id. at 78:15-79:2).[5] This requirement was in place, offers Hartman, relying on a section of a BOP training manual entitled "Staff Survival Skills", because the presence of "correctional worker[s] deters . . . assaults, suicide attempts, and other incidents that can be dangerous to [COs] as well

---

[5] The government disagrees with this characterization and contends that COs could leave inmates unattended in the dormitory for additional reasons, including to conduct rounds and perform other duties in the recreation deck or hall area (see, e.g., Martinez Dep. Tr. at 58:20-23, 60:4-16), or to use the bathroom (id. at 139:2-12).

6

as the inmates. Since inmates will violate regulations when and where they feel the risk of detection is lowest, [the presence of corrections officers] will deter this behavior." (Pl.'s Ex. M at 8.)

In a similar vein, plaintiff notes that COs are required by a BOP "program statement" -- a set of rules and guidelines that provide standards of conduct for all BOP employees -- to be "fully alert and attentive during duty hours." (Pl.'s Ex. N at 9.) This is because, according to the program statement, "[i]nattention to duty in a correctional environment can result in escapes, assaults, and other incidents." (Id.)

Hartman also relies on a post order that governs the 4:00 p.m. to 12:00 a.m. shift worked by Officer Sanders on the night of the assault. This order instructs that after "lights out" at 11:00 p.m., when the unit is "locked down and secured,"

> [*i*]*t is very important for you to conduct rounds of the unit when the lights are out. The inmates depend on you to protect them and enforce the rules ans [sic] regulations of the institution. Use your flashlight to illuminate your path and make frequent rounds of the unit, especially in the last two (2), three (3) rows. Ensure inmates are not being assaulted or fighting once the lights are out.*

(Pl.'s Ex. L at 22) (emphasis in original.) According to Martinez, after "lights out," a corrections officer "makes sure all the inmates are in their beds" and "does continuous rounds to make sure the inmates aren't getting up and wandering about." (Martinez Dep. Tr. at 65:19-66:7.)

Moreover, when conducting rounds, COs must vary their actions to avoid establishing a predictable "profile". Hartman asserts, again pointing to a BOP training manual and testimony from BOP personnel, that COs are required to "[a]void establishing daily patterns that are visible to the inmates" (Pl.'s Ex. M at 8), because if inmates are "up to something, or they want to do something, the first thing they're going to want to know is where's that officer. So if the officer

7

keeps them off times . . . it kind of deters what they're going to do." (Martinez Dep. Tr. at 72:9-16.)

Finally, Hartman maintains, relying on testimony from BOP witnesses, that BOP policy requires its staff to report threats against inmates to the Special Investigative Supervisor's ("SIS") Office. For example, according to Passaniti, it is "typically" true that the BOP requires a SIS lieutenant to evaluate all threats made against the safety of inmates and to "conduct their own assessment to rule out or validate [these] perceived threat[s]." (Passaniti Dep. Tr. at 75:18-76:5.)

This articulation comports with what Officer Sanders testified was, in any event, her own practice when an inmate approached her and said that he feared for his safety. According to Sanders, "you have to report that [threat] to the lieutenant or whoever, whoever comes around. You call him up and say this is what's going on, this is what the inmate told me. Then the lieutenant would take it from there." (Sanders Dep. Tr. at 55:12-21.) Sanders further testified that when she received an inmate complaint about safety, she was required to record it, and her response, in her logbook, and that she always complied with this requirement. (Id. at 56:2-10.)

Sanders was deposed on April 20, 2006. In a subsequently executed declaration, dated July 26, 2007, Sanders explained her typical practice in response to inmate complaints about safety slightly differently. Sanders stated that upon receiving an inmate's complaint, she "would consider the legitimacy of [that] complaint, the potential for inmate violence, the safety of the inmate, and [the] prison's need to preserve its available resources and to efficiently utilize its limited housing space before I contacted the lieutenant on duty." (Sanders Decl. ¶ 5.) Nevertheless, even when Sanders "determined that an inmate's complaint was not legitimate and

8

was simply a fabricated excuse to effect a transfer, I still would report the complaint to the lieutenant on duty or to the person who replaced me on my shift." (Id. ¶ 6.)

**C.      Procedural History**

Hartman initiated this action with a *pro se* complaint filed on October 11, 2000. After obtaining counsel, he amended his complaint on March 22, 2005 to allege statutory claims under the FTCA and constitutional claims following Bivens. Prior to the start of discovery, on June 13, 2005, the government filed a motion to dismiss, arguing that plaintiff's Bivens claims warranted dismissal for failure to exhaust administrative remedies and that the FTCA claims were barred by the discretionary function exception to FTCA. Hartman I, 2005 WL 2002455, at *1. On August 21, 2005, Judge Gleeson granted the government's motion with respect to Hartman's constitutional claims but denied the motion as to his FTCA claim grounded in Officer Sanders's conduct and decisions on the night of the assault. Id. at *12. In analyzing the FTCA claim, the Court concluded that the first prong of the discretionary function exception was met because "the duty of care owed by officers to inmates [under 18 U.S.C. § 4042(a)] did not compel Sanders to act in a particular way when supervising inmates or when confronted with inmate-on-inmate violence." Id. at *10. However, as to the second prong of the exception, the Court held that without testimony from Officer Sanders "concerning her actual judgment at the time . . . I cannot say as a matter of law that Sanders's actions may not implicate negligence 'unrelated to any plausible policy objectives.'" Id. (quoting Coulthurst v. United States, 214 F.3d 106 (2d Cir. 2000)).

Following discovery on the surviving FTCA claim, the government moved pursuant to Rules 12(b)(1) and 12(h)(3) to dismiss.

## II. DISCUSSION

### A. Standard of Review Under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a claim where the federal court lacks subject matter jurisdiction. In considering a motion to dismiss brought under Rule 12(b)(1), a court "must accept as true all material factual allegations in the complaint." Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004)). However, the court need not "draw inferences from the complaint favorable to plaintiffs." J.S., 386 F.3d at 110; Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). Finally, where, as here, "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Zappia Middle East Const. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 252 (2d Cir. 2000).

### B. The Discretionary Function Exception to FTCA

FTCA waives the sovereign immunity of the United States for personal injury suits "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). However, this general waiver is limited by 13 exceptions to liability, codified in 28 U.S.C. § 2680, under one of which -- the so-called "discretionary function exception" -- the government seeks refuge: the United States remains immune from suit where a claim is based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 29 U.S.C. § 2680(a). As the Supreme Court has noted, the "purpose of the exception is to

prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. Gaubert, 499 U.S. 315, 323 (1991) (internal quotations omitted). If a claim falls within the exception, a federal court will not have subject matter jurisdiction to entertain it. Fazi v. United States, 935 F.2d 535, 537 (2d Cir. 1991).

The discretionary function exception will apply and exempt the United States from suit if two conditions are satisfied. First, "the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation." Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 325; Berkowitz v. United States, 486 U.S. 531, 536-37 (1988)). As the Supreme Court has explained, "[t]he requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Gaubert, 499 U.S. at 322 (internal quotations omitted). Second, "the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 325; Berkowitz, 486 U.S. at 536-37). If "established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion" such that the first prong of the test is satisfied, "it must be presumed [with respect to the second prong,] that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324. However, this presumption is not irrefutable. As the Supreme Court has cautioned, "even assuming the challenged conduct involves an element of judgment," a court still must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Id. at 322-23. If "the challenged actions are not the kind of conduct that can be said to be grounded in

11

the policy of the regulatory regime," the discretionary function exception will not bar the claim. Id. at 324-25; Berkowitz, 486 U.S. 546-47 (if a government agent's "act simply does not involve the exercise of [policy] judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful"); see Andrulonis v. United States, 952 F.2d 652, 654-55 (2d Cir. 1991).

**C.      The Applicability of the Discretionary Function Exception to Officer Sanders's Conduct and Decisionmaking**

As already noted, in Hartman I, Judge Gleeson held that the first prong of the discretionary function exception was met because the duty of care owed by officers to inmates under 18 U.S.C. § 4042(a) -- the only statute or regulatory provision before the Court at the time of its decision -- "did not compel Sanders to act in a particular way when supervising inmates or when confronted with inmate-on-inmate violence." 2005 WL 2002455 at *10.[6] Plaintiff asks the Court to reconsider its ruling on the first prong, given subsequent discovery, and to conclude that the various BOP rules, regulations, and orders he now cites compelled Officer Sanders to perform her duties in a specific manner; that is, to hold, on review, that the government has not met the first prong of the discretionary function exception and permit Hartman's claim to proceed. Alternatively, plaintiff argues that even if Sanders had discretion under the regulatory scheme, that is, assuming the government meets its burden on prong one, her conduct and decisions on the night of the assault -- specifically, (1) her failure to report the threats made against Hartman that plaintiff allegedly relayed to her prior to the assault; (2) her decision to conduct rounds in a predictable, routinized fashion; and (3) her failure to be at her post at the time of the attack or, in any event, her failure to respond to the assault on plaintiff for at least 15

---

[6] The presumption favoring the government on the second prong of the exception did not carry the day, however, for as already noted, the Court ruled that Hartman, without discovery, did not have a fair opportunity to develop evidence that could rebut it. See Hartman I, 2005 WL 2002455 at *10.

12

minutes -- were the products of laziness or carelessness and were not grounded in considerations of BOP policy. This conclusion, too, would mandate denial of defendant's current motion. In contrast, the United States asserts that Sanders's actions involved elements of judgment or choice not prescribed by statute, regulation, or policy (that is, Hartman still fails on prong one), and that her specific decisions implicated considerations of public policy (barring a finding in Hartman's favor on prong two).[7] Assuming, without deciding, that the BOP regulations and policies Hartman identifies still allowed Officer Sanders discretion in the exercise of her duties, the question squarely presented is whether plaintiff has provided sufficient evidence at this stage to show that the challenged actions and decisions were not "grounded in considerations of governmental policy," as required by the second prong of the discretionary function exception. Coulthurst, 214 F3d. at 109; see Gaubert, 499 U.S. at 324-25.

While a judgment or choice that is grounded in considerations of public policy will fall within the discretionary function exception, Coulthurst, 214 F.3d at 109, certainly not every discretionary decision, even if it takes place against the broad backdrop of a regulatory scheme, is susceptible to policy analysis. See Andrulonis, 952 F.2d at 655; Cope v. Scott, 45 F.3d 445, 448 (D.C. Cir. 1995). "Virtually any government action can be traced back to a policy decision of some kind, but an attenuated tie is not enough to show that conduct is grounded in policy." Shansky v. United States, 164 F.3d 688, 692 (1st Cir. 1999). Thus, for example, if a government agent who is imbued with discretion behaves in a manner that is lazy or careless, his conduct cannot be said to be grounded in considerations of public policy and the discretionary function

---

[7] As a subset of its main arguments, the government asserts that Sanders's decision not to intervene physically in the assault once she arrived on the scene and her judgment concerning when to activate her body alarm to summon help are protected by the discretionary function exception. Hartman does not dispute these arguments in his opposition papers and the Court therefore deems abandoned any theory of FTCA liability that stems from these specific actions.

13

exception will not shield him from suit. Coulthurst, 214 F.3d at 109-11; see also Triestman, 470 F.3d at 475-76.

In Coulthurst, the Second Circuit vacated a decision of the district court which had found that the discretionary function exception applied to a claim by a prisoner alleging that officials were negligent and careless in "fail[ing] to diligently and periodically inspect" weight room equipment that broke down and injured the plaintiff. Id. at 107-08. The Circuit observed that plaintiff's papers could be fairly read to allege several distinct theories of government negligence. To the extent plaintiff sought to target the government's decisions regarding the content or scope of the equipment inspection, as designed, or its planned frequency, the discretionary function exception would apply. Id. at 109. Of course, the allegations "might also refer to a very different type of negligence." Id. The prison official charged with responsibility for the equipment may, in "laziness or haste . . . have failed to do the inspection he claimed;" or, "distracted or inattentive . . . [he may have] failed to notice the frayed cable" that snapped, causing plaintiff's injury; or, he may have "been too lazy to make the repairs or deal with the paperwork involved in reporting the damage." Id. These sorts of negligent acts, the court held, "neither involve an element of judgment or choice within the meaning of Gaubert nor are grounded in considerations of governmental policy," and thus could not be immunized from suit under the discretionary function exception. Id. at 110; Triestman, 470 F.3d at 476 (recognizing that the "negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction"); Enigwe v. Zenk, No. 03-CV-854, 2007 WL 2713849, at *9 (E.D.N.Y. Sept. 14, 2007) (noting that "certain negligent acts, such as those borne out of laziness, hastiness, or inattentiveness, fall so far outside the range of appropriate judgment that they can no longer be viewed as an exercise of discretion").

14

Coulthurst greatly informs the Court's analysis here.  Hartman asserts that Officer Sanders's conduct on the night of the assault was lazy, careless, or inattentive in three ways, each of which falls within the ambit of the negligent guard theory of liability.  First, Hartman argues that Sanders was lazy or careless in failing to report the threats made against Hartman that plaintiff allegedly relayed to her prior to the assault.  Plaintiff has provided evidence which indicates that he approached Officer Sanders on the afternoon of June 24, 1998, apprised her of "what was going on," told her that he did not feel safe in Unit 3 North, and expressed that he wanted to be transferred for his protection.  (Hartman Dep. Tr. at 122:25-123:8.)  Sanders, for her part, acknowledged that "you have to report [inmate complaints about safety] to the lieutenant or whoever [and t]hen the lieutenant would take it from there."  (Sanders Dep. Tr. at 55:12-21.)  Moreover, she testified that she was required to record such complaints, and her responses to them, in her logbook, a requirement with which she believed she always complied.  (Id. at 56:2-10.)  Nevertheless, Sanders, it appears, never reported any such conversation with Hartman to anyone, nor did she record it in her logbook.  This proffered failure of action, set against what Sanders explained was her regular approach to such situations, is sufficient to insulate plaintiff's claim from dismissal under Rule 12(b)(1).[8]  See Coulthurst, 214 F.3d at 111 ("absent-minded or lazy failure to notify the appropriate authorities upon noticing the damaged cable" an example of negligence not involving considerations of public policy); Montez v. United States, 359 F.3d 392, 398 (6th Cir. 2004) ("decisions by prison officials to ignore specific and immediate threats against inmates are less likely to be the type of decision that can be said to be grounded in the underlying policy of the BOP"); cf. Brown v. United States, No. 00-CV-529,

---

[8] Of course, it may be true that Sanders never reported nor recorded a threat to Hartman because no conversation between the two ever took place.  However, the ultimate resolution of this question of fact must await trial.  For now, at the Rule 12(b)(1) stage, the Court is satisfied that plaintiff has presented sufficient evidence to establish a basis for subject matter jurisdiction over his claim.  See Triestman, 470 F.3d at 476; Aurecchione v. Schoolman Trasp. Sys., Inc., 426 F.3d 635, 638-39 (2d Cir. 2005).

15

2001 WL 477250, at *2 (E.D.N.Y. Mar. 19, 2001) (Raggi, J.) (negligent guard theory inapplicable where plaintiff presented no evidence to support "the conclusion that there was anything inattentive, hasty, or lazy about the actual [conduct at issue]. Plaintiff's complaint is with the policy decision made by prison authorities, not with its negligent execution").

Likewise, Sanders's alleged carelessness in conducting rounds in Unit 3 North is not susceptible to policy analysis. Hartman points to notations in the officer's logbook, and her accompanying testimony, which indicate that on the night of the assault, Sanders went on rounds every 30 minutes, on the hour and half-hour. (Pl.'s Ex. P at 2; see also Sanders Dep. Tr. at 100:6-11, 118:3-6.) According to Hartman, Sanders's performance of her rounds in such a predictable, routinized fashion showed a careless disregard for her training (see Pl.'s Ex. M at 8) and created an opportunity for his assailants to attack (see Martinez Dep. Tr. at 72:9-16) (if inmates are "up to something, or they want to do something, the first thing they're going to want to know is where's that officer. So if the officer keeps them off times . . . it kind of deters what they're going to do.") As further support for this point, Hartman offers the testimony of one of the BOP's own Rule 30(b)(6) witnesses, who, when asked if he noticed "anything unusual" in the way Sanders's rounds were logged on the night of the assault, replied: "[y]es . . . I think she was profiling it [sic] herself every 30 minutes." (Passaniti Dep. Tr. at 53:13-18.)

Assuming, as the Court does, that Sanders had discretion consistent with the policy objectives of the BOP over the manner in which she conducted rounds, her alleged failure -- out of laziness or carelessness -- to avoid profiling herself cannot be immunized merely by evoking that general discretion. See Coulthurst, 214 F.3d at 109-10. The Second Circuit's decision in Andrulonis, which found the discretionary function exception inapplicable to a federal

government scientist's negligent failure to maintain proper safety procedures and to warn laboratory workers of potential dangers, is instructive:

> Looking at the 'nature of the conduct' in this situation, we do not see how [the scientist's] negligent omission could possibly have been grounded in [his agency's] policy scheme. Nothing indicates that [agency] policy required, or even encouraged, [the scientist] to ignore unsafe laboratory conditions and thereby unnecessarily place the lives of laboratory workers at risk in order to further a scientific cause or any other objective of the government. The general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad and indefinite to insulate [the scientist's] negligent conduct.

Andrulonis, 952 F.2d at 655. Similarly, nothing on the evidentiary record indicates that BOP policies required, or even encouraged, Sanders to conduct rounds in a routinized fashion that would create an opportunity for inmates to act violently. While, again, the ultimate adjudication of the facts at trial may result in the determination that Sanders's conduct was not negligent, the Court concludes at this stage that the discretionary function exception cannot bar subject matter jurisdiction. See id.; Caraballo v. United States, 830 F.2d 19, 22 (2d Cir. 1987) (discretion over whether and how to implement beach patrol did not shield government from actions challenging negligent execution of patrol); Marshall v. United States, No. 99-CV-3877, 2001 WL 34064770, at *1 (S.D.N.Y. July 25, 2001) (allegations that prison official was careless in carrying out searches of inmates' living quarters and personal property sufficient to withstand Rule 12(b)(1) motion to dismiss); Lemke v. City of Port Jervis, 991 F. Supp. 261, 265 (S.D.N.Y. 1998).

Finally, Sanders's uncontroverted failure to respond to the assault on plaintiff until at least 15 minutes after it began does not garner the protections of the discretionary function exception, irrespective of whether she was at her post during the time of the attack. As demonstrated by plaintiff, Sanders's logbook reflects that she counted the number of inmates present in Unit 3 North at 9 p.m. and determined that all were present. (See Pl.'s Ex. P at 1.)

17

Two hours later, at 11 p.m., she placed the unit in lock down, effectively shutting down the unit for the night with all of the inmates in one place, inside the dormitory room. (See Martinez Dep. Tr. at 65:20-25) ("[t]he TVs are shut off, all the rooms are locked, the activity rooms, the TV rooms, the kitchen, the unit door's secured, the recreation area, everything is shut down.") Sanders testified that she understood that it was at this time, after lock down, that "the inmates usually g[o]t the most mischievous." (Sanders Dep. Tr. at 125:13-126:3.) Yet, despite all this, Sanders did not respond to the dormitory room attack on Hartman -- an attack that involved "a lot" of inmates (Hartman Dep. Tr. at 140:24-141:8), caused plaintiff to call out repeatedly to the CO for help, and attracted the attention of other prisoners in the front of the room -- for at least 15 minutes. Assuming, once more, that Sanders had discretion in carrying out her responsibilities, her failure to observe for at least a quarter hour a noisy, violent altercation occurring within a room containing all of the inmates under her supervision, is the sort of careless act over which her general freedom of decision cannot be said to extend. Hartman's evidence is more than sufficient to show that Sanders was distracted or inattentive to her duties in a manner that cannot be explained on policy grounds nor shielded under the discretionary function exception. See, e.g., Coulthurst, 214 F.3d at 109-10; Andrulonis, 952 F.2d at 655; Valet v. United States, No. 04-CV-4957, 2006 WL 624897, at *2 (E.D.N.Y. Mar. 9, 2006).

In advocating dismissal, the United States argues that Sanders's "actual subjective judgment was grounded in public policy" and emphasizes that the officer was required to balance numerous policy considerations while performing her day-to-day duties. (Def.'s Mem. Supp. Mot. to Dismiss at 24.) That Sanders's duties, generally, required her to take into account policy considerations is undoubtedly true. However, where, as here, plaintiff has argued, with supporting evidence, that an official has been careless or inattentive in the execution of her

18

responsibilities, reliance by the government on that official's general discretionary authority is no bar to suit. Pointedly, it overcomes Gaubert's presumption that "a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." 499 U.S. at 324 (noting that dismissal is inappropriate where "challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime"); Triestman, 470 F.3d 475-76; Coulthurst, 214 F.3d at 109-11.

The government's attempt to rebuff this conclusion by analogy to the Seventh Circuit's decision in Calderon v. United States, 123 F.3d 947 (7th Cir. 1997), is unavailing. In Calderon, an inmate who was injured in a prison attack sued the government under FTCA, arguing that the BOP failed to separate him from his assailant prior to the assault, even though plaintiff had told BOP personnel about the threats he faced. Id. at 948. In evaluating the applicability of the second prong of the discretionary function exception, the Seventh Circuit rejected plaintiff's blanket contention -- not made by Hartman here -- that "policy judgment is not involved in day to day . . . actions of correctional officers" and emphasized instead the general need of officers to balance various policy considerations while on the job. Id. at 950-51. Noting that the plaintiff had not "presented any facts which would support a finding that the BOP's action not to take disciplinary action against [the assailant] was based on grounds other than considerations of public policy," the court of appeals concluded that the exception applied and affirmed dismissal of the action by the district court. Id. Of course, the presentation not made in Calderon is precisely that which is offered by Hartman. Plaintiff, again, has presented facts that the Court concludes supports a finding that Officer Sanders's decisions were careless or inattentive and not rooted in policy considerations.[9] At the Rule 12(b)(1) stage, that is all that is required for

---

[9] For example, and in contrast to Calderon, Hartman does not quibble with the BOP's discretion over whether actually to transfer him to another location at the MDC; his is a challenge, in part, to Sanders's failure simply to

19

plaintiff's cause of action to continue.[10]  See Triestman, 470 F.3d at 476; Aurecchione, 426 F.3d at 638-39.

### III.     CONCLUSION

For the foregoing reasons, the United States's motion to dismiss Hartman's FTCA claim under Rules 12(b)(1) and 12(h)(3) is denied.

SO ORDERED.

Dated: Brooklyn, New York
       March 23, 2009

                                            s/ENV                              _
                                            ERIC N. VITALIANO
                                            United States District Judge

---

relay word of his danger, as she testified she otherwise regularly does, so as to enable the discretionary evaluation of his transfer request by the official entrusted with that judgment.

[10] To the extent the government argues that Calderon can be read specifically to foreclose relief under a negligent guard theory of liability -- a reading this Court does not share -- the Court would, in any event, be constrained to follow the more recent decisions of the Second Circuit in Coulthurst and Triestman, which "clearly" permit recovery in such circumstances.  Triestman, 470 F.3d at 476; Coulthurst, 214 F.3d at 110.